DROVERS' NAT. BANK OF UNION STOCK-YARDS *v.* ALBANY COUNTY BANK.

(*Circuit Court, N. D. New York.* December 1, 1890.)

BANKS AND BANKING—CONTRACT TO PAY DRAFTS—STATUTE OF FRAUDS.

In February, 1883, plaintiff bank wrote to the defendant bank: "G. was at our office to-day, and arranged for us to cash his stock tickets, and draw on him for the amount and exchange with the tickets attached. He referred us to you, saying you would say such drafts would be paid through your bank all right. Please advise us regarding it and oblige." Defendant replied February 19, 1883: "We will pay your drafts on G. with his stock tickets attached." Thereafter the plaintiff cashed such of G.'s stock tickets as were presented, and drew on him for the amounts, and forwarded the drafts with the tickets attached for collection of defendant. These transactions took place two or three times a week, and sometimes less frequently. The drafts varied from $300 to $12,000, and the aggregate from February 19, 1883, to November 8, 1888, was over $600,000. The defendant paid the drafts and charged them to G., whether his account was good for them or not, but it refused to pay the two drafts in suit drawn November 7 and 8, 1888, for $389.92 and $4,789.05, respectively. *Held* that, considered with reference to the situation of the parties, and their subsequent acts evincing their own understanding, the letter of February 19, 1883, must be construed as a continuing promise, and not merely as one to pay drafts for stock tickets which the plaintiff had already cashed, or arranged to cash; and that the consideration was sufficiently disclosed to satisfy the statute of frauds.

At Law.

*S. W. Rosendale*, for plaintiff.

*N. E. Kernan*, for defendant.

WALLACE, J. The following facts were proved upon the trial in this case: Previous to February 16, 1883, and from that time to and including November 8, 1888, Michael Gillice, of Albany, N. Y., was a cattle dealer and purchaser of cattle at Chicago, Ill., where his brother acted as his agent, buying according to the customary course of the cattle trade in Chicago at the premises of the Union Stock-Yard & Transit Company. Upon purchases the seller gives the purchaser a ticket signed by the secretary of the company, stating the number, description, and weight of the cattle bought, with the name of the seller and buyer, which is in effect a certificate that the buyer has bought such cattle at the yard of the company. The aggregate purchase price is placed by the secretary

in figures on the back of the ticket, and below them is indorsed an order directing the bank, which has its place of business at the stock-yard, to pay for the number of cattle certified as purchased. The purchaser signs this order, and delivers the stock ticket to the seller, who uses it by getting it cashed at the bank named in the order, or at any other bank which is willing to cash it. Gillice did not keep an account at either of the stock-yard banks, but the Union Stock-Yard Bank had been accustomed to cash his tickets, and draw upon him for their amount, attaching the ticket to the draft, and forwarding both to the defendant for payment. During all this time, Gillice kept an account with the defendant. February 16, 1882, Gillice and the plaintiff entered into an arrangement by which the plaintiff was to cash Gillice's tickets when presented by holders at a specified discount, provided the defendant would agree to protect the drafts plaintiff should draw upon Gillice for the tickets cashed. Thereupon the plaintiff wrote to defendant the following letter, of the date of February 16, 1883:

"Mr. M. C. Gillice was at our office to-day, and arranged for us to cash his stock tickets, and draw on him for the amount and exchange with tickets attached. He referred us to you, saying that you would say such drafts would be paid through your bank all right. Please advise us regarding it, and oblige."

Shortly afterwards the plaintiff received from the defendant a reply to the foregoing letter, dated February 19, 1883, as follows:

"In reply to your favor of the 16th inst., we say that we will pay your drafts on M. C. Gillice with his stock tickets attached, by remitting the amount to your New York correspondent, or through our exchanges, as you prefer."

Thereafter, and until and including November 8, 1888, the plaintiff cashed such of Gillice's tickets for cattle purchases as were presented to it by its customers and other holders, and drew on him for the amount of the tickets, accompanying its drafts with the tickets, and forwarding the drafts and tickets to its correspondent for collection of the defendant. These transactions took place sometimes two or three times a week, and sometimes less frequently, and the drafts drawn varied in amount from $300 to $12,000; and the aggregate amount of tickets cashed and drafts drawn during the period from February 19, 1883, to November 8, 1888, was over $600,000. The defendant always paid these drafts and charged them to Gillice, whether his account was good for them or not, it having collateral security for any advances made to him. But it refused to pay the two drafts in suit, one of which was drawn by plaintiff November 7, 1888, for $389.92, and the other November 8, 1888, of $4,789.05. These drafts were drawn by the plaintiff upon Gillice, and forwarded in the usual way for collection of the defendant with the tickets attached. Until after these drafts were forwarded, the defendant never informed the plaintiff of its purpose to terminate its obligation under its letter of February 19, 1883; but about that time Gillice became embarrassed, and the defendant lost the benefit of the collateral security it had theretofore had. The plaintiff and defendant were each corporations, organized

and doing business as alleged in the complaint. There was due for principal and interest upon the two drafts at the time of the trial the sum of $5,811.66.

If the two letters read together amount to a promise by the defendant to pay such sums as the plaintiff might thereafter advance in cashing Gillice's stock tickets, and draw for upon him, there can be no fair doubt that the consideration is sufficiently disclosed by the writing within the statute of frauds. *Stadt* v. *Lill*, 9 East, 348; *Warrington* v. *Furbor*, 8 East, 242; *Jarvis* v. *Wilkins*, 7 Mees. & W. 410. A promise to pay money for goods thereafter to be delivered, or services thereafter to be performed, is equivalent to a request by the promisor to the promisee to deliver the goods or perform the services. The more doubtful question in the case is whether the promise by the defendant is to be construed as a continuing one, or only as one to pay drafts for stock tickets which the plaintiff had already cashed, or arranged to cash, for Gillice. The meaning of the parties, as expressed in the two letters, is not altogether intelligible, and therefore it is competent to resort to extrinsic evidence, and consider the surrounding circumstances, the situation and relation of all the parties to the transaction, their previous course of dealing, and their subsequent acts evincing their own understanding, in order to ascertain the meaning of the language used. *Heffield* v. *Meadows*, L. R. 4 C. P. 595; *Field* v. *Munson*, 47 N. Y. 221; *Bank* v. *Myles*, 73 N. Y. 335. Read with the aid of this evidence, the more reasonable conclusion is that the promise of the defendant was understood by the parties as applying to future transactions, and should be treated as a continuing one. Judgment is ordered for the plaintiff for $5,811.66 as of November 19, 1890.